By the Court:
The exception that the complainant’s bill is prematurely filed, because he was not invested with a legal title at the time of filing it, is, in our opinion, untenable. It is, we think, sufficient to warrant a decree in his favor, that the patent to him has issued when the decree is pronounced, if the other facts in the case entitle him to a decree.
The equity of the complainant rests upon his elder entry, finally surveyed and carried into grant, under the laws of the United States. The defendant denies that that entry can be sustained, because it is not founded upon a warrant issued in the ordinary way, for services performed in the Virginia line, upon continental establishment.
Whilst the territory within which these lands lie, was the property of the State of Virginia, and subject to her jurisdiction, she engaged, so early as October, 1776, to bestow land bounties upon those who should engage in the military service of the revolutionary war. The date of the original engagements of 1776, and 1778 have not been preserved in the published codes of Virginia, and consequently are not found in our own collection of land laws. In May, 1779, a general law was passed providing for granting warrants to those entitled under the. laws, and describing the evidence upon which the grant should be made. It would seem that the case of Pai’ker did not come within these general provisions, and therefore a special resolution was passed, directing a warrant to be issued to him, as for services performed in the Virginia line, upon continental establishment. The evidence adduced, in this case, shows that he performed very nearly three years’ service in that line, and that he performed other approved military services, in the commonwealth of Virginia, upon account of which the special resolution was adopted.
*463 The same legislature that voted the resolution, at the same session, passed the law reserving the lands between the *Miami and Scioto rivers to satisfy the military bounties the state had engaged to her citizens. Aud at the same session, the law was passed consenting to cede the territory northwest of the Ohio to the United States upon the terms proposed by Congress. On March 11, 1784, the deed of cession was executed and accepted. This deed contains a provision that the land between the Miami and Scioto rivers should be appropriated, if necessary, to satisfy the legal bounties so engaged. The terms of the reservation are as follows: “That, in case the quantity of good lands, on the southeast side of the ,Ohio, upon the waters of Cumberland river, and between the Green river and Tennessee river, which have been reserved by law for the Tirginia troops upon continental establishment, should, etc., prove insufficient for their legal bounties, the deficiency shall be made up to the said troops, in good lands, to be laid off between the Scioto and the Little Miami, on the northwest side of the Ohio river, in such proportions as have been engaged to them by the laws of Tirginia.”
At the time this reservation was stipulated and made, Parker held his warrant, under the resolution, for services actually performed as one of the Tirginia troops upon continental establishment, and it seems to us that his case is fairly covered by the terms of the reservation. He was entitled, under the laws of Tirginia, as Tirginia had herself decided, and he was in possession of the appropriate evidence of his right. That right was not less predicated upon the laws of Tirginia, because the evidence of it issued in conformity to a resolution, instead of a general law. The services actually performed, were the foundation upon which it rested, the consideration upon which it issued, and it stood as fairly upon the law as any other ease whatever. Ve see no principle to distinguish it from the great mass of claims to be satisfied out of the lands reserved. But if any difficulty existed on this ground, it seems to have been entirely removed by the legislation of Congress on the subject.
The act of March 3, 1807, fully recognizes the validity of these resolution warrants, so far as they were issued upon resolutions passed previous to the cession from Tirginia to'the United States. The proviso of the first section of that act must be understood as relating to warrants issued upon resolutions ^adopted sub *464 sequent to the cession. Rights confirmed at the time of the cession are not contemplated by it. Por it would be highly unjust and improper that Congress should institute an inquiry into the validity of individual rights, completely vested when the right of the United States accrued.
Section 2 of the act of March 1, 1823, revives the act of March 3, 1807, and gives four years from January 4,1823, to return the surveys and obtain patents on location upon resolution warrants. Within this period the survey was made and returned. So that, according to the provisions of the act of Congress, the title has been consummated in the complainants. The patent obtained by the defendant upon a junior entry stands upon no better footing than if the complainant’s entry was on a warrant issued in the ordinary manner, for services performed in the Virginia line upon continental establishment. The case is not analogous to an entry predicated upon a warrant for services in the state line.
In the cession to the United States, no reservation was made in favor of those to whom bounties were engaged, for military services in the state line. Consequently they, were excluded from making location in the reserved territory northwest of the Ohio. But those claiming under resolution warrants, for services performed in the Virginia line, upon continental establishment, were included in the reservation, and their rights are not distinguishable from others, in whose favor the reservation was made.
By deciding that the entry of the complainant is a good and valid entry, which entry ought to be sustained against an elder patent founded on a junior entry, we do not impeach the decision of the Supreme Court of the United States in the case of Miller v. Kerr, cited by the defendant’s counsel. And in respect to this case, it is pertinent to remark, that from the doctrine advanced in Hoofnagle v. Anderson, decided at the next subsequent term, it may well be doubted whether the court were entirely satisfied with their resolution in the former case.
It is evident that the title of the defendant commenced in 1823, when the complainant was in actual possession, and was originated with a view to speculation alone. It is not an accidental confliction of title, where the latter locator honestly ^supposed he was appropriating unappropriated lands. In this state of the case, he is entitled to no favor in a court of equity. He stands upon his legal rights altogether. And these are to be decided upon with the se *465 verest scrutiny into their absolute obligation. All equitable considerations operate in favor of the complainant, whom, we conceive, entitled to a decree for the conveyance asked by the bill.